Filed 1/7/21 (mod.); pub. order 12/18/20 follows unmodified opinion (attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| 11 LAGUNITA, LLC, et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>CALIFORNIA COASTAL COMMISSION,<br><br>    Defendant and Appellant. | G058436<br><br>(Super. Ct. No. 30-2018-01013545)<br><br>ORDER MODIFYING OPINION, AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that our opinion filed on December 4, 2020, be modified as follows:

1. On page 23, footnote 5, first line, after the word "desist" add the word "order."

2. On page 23, footnote 5, second line, add an apostrophe after the word "Katzes."

3. On page 35, second paragraph, second sentence, delete the word "implied."

4. On page 35, third paragraph, delete the complete second sentence and *Finney* citation.

5. On page 35, fourth paragraph, first line, delete the word "noted" and replace with the word "analyzed."

6. On page 36, first incomplete paragraph, add the following sentence at the end of the paragraph after the word "so": "The Commission later adopted the staff's analysis when it imposed the fine."

7. On page 36, second paragraph, fourth sentence, delete the word "implicitly."

8. On page 36, second paragraph, delete the *Finney* citation after the word "actions."

The petition for rehearing is DENIED. This modification does not change the judgment.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.

Filed 12/4/20; Certified for Publication 12/18/20 (order attached) (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| 11 LAGUNITA, LLC, et al., Plaintiffs and Appellants, v. CALIFORNIA COASTAL COMMISSION, Defendant and Appellant. | G058436 (Super. Ct. No. 30-2018-01013545) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Randall J. Sherman, Judge. Affirmed in part and reversed in part.

O'Melveny & Myers, Dimitri Portnoi, Heather Welles, Marissa Roy; Nossaman, John J. Flynn III, Stephanie N. Clark and Steven H. Kaufmann for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Daniel A. Olivas, Assistant Attorney General, Jamee Jordan Patterson, Deputy Attorney General for Defendant and Appellant.

Rutan & Tucker and Philip D. Kohn as Amicus Curiae on behalf of Plaintiffs and Appellants.

\*　　　\*　　　\*

The California Coastal Act of 1976 established the California Coastal Commission.  (See Pub. Resources Code, § 30000 et seq.; the Coastal Act.)[1]  "The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California.'"  (*Pacific Palisades Bowl Mobile Estates LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793-794 (*Pacific Palisades*).)

A seawall is a retaining wall that runs parallel to the shoreline.  A seawall protects land and structures behind the seawall from erosion and flooding.  However, seawalls are disfavored by the Coastal Commission, in part, because the soil behind the seawall can no longer replenish the sand on the beach through natural erosion, eventually causing the beach to disappear.

Generally, the Coastal Act requires a Coastal Development Permit (CDP) for any development in the coastal zone.  This case involves a CDP issued by the Coastal Commission in 2015 for the reinforcement of an existing seawall, which had been installed years earlier at the base of a 1950's era Laguna Beach home (as pictured below).



[1] Further undesignated statutory references are to the Public Resources Code.

Significantly, a condition of the CDP provided it would expire and the seawall would have to be removed if the home were "redeveloped in a manner that constitutes new development." The homeowners reinforced the seawall, but they also remodeled the home without consulting the Commission (as pictured below).



003284

The Coastal Commission found that the homeowners had violated the CDP by redeveloping the residence in a manner that constitutes new development. The Commission issued a cease and desist order requiring the removal of the seawall and further imposed a $1 million administrative penalty for the violation. The homeowners challenged those orders in court by filing a petition for writ of mandate.

The trial court denied the petition for writ of mandate as to the cease and desist order (affirming the Coastal Commission's ruling); the court granted the petition as to the penalty (reversing the Commission's ruling). The homeowners filed an appeal as to the cease and desist order. The Commission filed a cross-appeal as to the penalty. The City of Laguna Beach (the City) filed an amicus brief in support of the homeowners.

We affirm the trial court's ruling as to the cease and desist order and we reverse the court's ruling as to the administrative penalty.

# I

## FACTS AND PROCEDURAL HISTORY

In 2005, the Coastal Commission first approved an emergency CDP for a seawall located at 11 Lagunita Drive in Laguna Beach. The home was built in 1952 and is located on an ocean blufftop. The surrounding property extends from a private road all the way to the sand on Victoria Beach. The homeowner built the seawall larger than permitted and failed to obtain a follow up CDP as required. The unpermitted seawall remained for over 10 years.

In May 2014, the City approved a CDP for a new homeowner that had purchased the property. The City's locally issued CDP provided after-the-fact authorization for the seawall, approval for the reinforcement of the seawall, and approval of the remodel of the residence. Two commissioners filed an appeal from the locally issued CDP with the Coastal Commission. The Commission maintained that the local CDP violated the City's Local Coastal Program.[2]

Throughout the remainder of 2014, the homeowner's architect and agent Jim Conrad communicated with the Coastal Commission. It was the position of the Commission staff that "the seawall could only remain and be repaired if it were to protect the existing structure." Conrad agreed to scale back the proposed remodel project, stating "we would like to eliminate the home remodel portion of the CDP application at 11 Lagunita. It is very clear after our meeting last week that staff will not support the proposed remodel of the home. The owners would like to just do some cosmetic remodeling, not subject to a CDP, and move on with their lives."

---

[2] A local government may issue a CDP under a Local Coastal Program certified by the Coastal Commission. A decision by a local government may be appealed to the Commission when there is a "substantial issue" as to the conformity of the locally issued CDP with the Coastal Act and the Local Coastal Program. (§ 30625, subd. (b)(1).) The appeal can be filed by "an applicant, any aggrieved person, or any two members of the commission." (§ 30625, subd. (a).)

4

*The Coastal Commission's 2015 CDP*

In October 2015, the Coastal Commission approved a CDP for the reinforcement of the seawall (issued in December 2015). According to the Commission's staff report: "The applicant has revised the proposed project to eliminate the additions to and remodel of the residence that the City approved, and now requests authorization and reinforcement of the unpermitted seawall . . . ."

The 2015 CDP generally allowed for structural reinforcements and visual improvements to the seawall. The CDP included Special Condition Two: "**Duration of Armoring Approval as Related to the Existing Bluff Top Residence.** [¶] A. Authorization Expiration. This [CDP] authorizes the seawall to remain until the time when the currently existing residence requiring protection is: A) redeveloped in a manner that constitutes new development; B) is no longer present or becomes uninhabitable; or C) no longer requires a shoreline protective device, whichever occurs first. Prior to the anticipated expiration of the permit and/or in conjunction with redevelopment of the property, the Permittee shall apply for a permit amendment to remove the seawall or to modify the terms of its authorization."

The 2015 CDP also included Special Condition Six: "**Future Development of the Site**. Future development, which is not otherwise exempt from [CDP] requirements, or redevelopment of the existing structure on the bluff top portion of the applicant's property, shall not rely on the permitted seawall to establish geologic stability or protection from hazards. Any future new development on the site shall be sited and designed to be safe without reliance on shoreline protective devices."

The 2015 CDP also included Special Condition 11: **"Deed Restriction.** PRIOR TO ISSUANCE OF THE . . . PERMIT, the applicants shall submit to the Executive Director for review and approval documentation demonstrating that the landowners have executed and recorded against the parcel(s) governed by this permit a

5

deed restriction, . . . imposing the Special Conditions of this permit as covenants, conditions and restrictions on the use and enjoyment of the Property."

The 2015 CDP further included Standard Condition Three: "**Interpretation**. Any questions of intent or interpretation of any condition will be resolved by the Executive Director or the Commission."

The 2015 CDP also included Standard Condition Five: "**Terms and Conditions Run with the Land.** These terms and conditions shall be perpetual, and it is the intention of the Commission and the permittee to bind all future owners and possessors of the subject property to the terms and conditions."

*The Remodel of the Residence*

In November 2015, Jeffrey and Tracy Katz (11 Lagunita LLC, collectively the Katzes) purchased 11 Lagunita Drive. The Katzes live next door and purportedly bought the property for investment purposes. The Katzes employed Conrad as their agent and architect, the same person employed by the prior homeowner. Conrad contacted the City for approvals, but Conrad did not contact the Commission.

In July 2016, the City issued building permits for the reinforcement of the seawall and an interior retaining foundation wall (there is no dispute that this was within the scope of the work approved by the Coastal Commission in the 2015 CDP).

In July and August 2016, the City also issued building permits for additional interior and exterior remodel work to the residence (this work is the subject of this appeal). The City's Building Division did not classify the project as a "major remodel." The City determined that the remodel was exempt from CDP requirements.

In January 2017, after the remodel of 11 Lagunita Drive was well under way, a neighbor sent a letter to the City requesting that it issue a stop work order. The neighbor alleged the project was inconsistent "with the policies and regulations of the General Plan, Municipal Code and Coastal Act." In an internal e-mail, a City building

6

official stated "the project is a 100 percent remodel and addition which is why we required them to install fire sprinklers. Every area inside and outside of the house has been rebuilt." Later, in response to the neighbor's letter, the City stated less than 50 percent of the exterior wall framing or floors and roof systems had been demolished, therefore the remodel was not a "major remodel" as defined by Laguna Beach Municipal Code section 25.08.024.[3]

The Coastal Commission eventually became aware of the on-going remodel. The now months-long construction project involved the demolition of all the exterior walls down to their studs, the removal and replacement of the roofing materials, and the reinforcement of the entire framing system for the home. Eventually, virtually all components of the home would be demolished, removed, and replaced (interior walls, floors, windows, doors, counters, cabinets, plumbing, electric, etc.). The remodel reportedly increased the value of the home from $14 million to $25 million.

*The Coastal Commission's Enforcement Actions*

In April 2017, the Coastal Commission sent an enforcement violation letter alleging the Katzes' remodel of the 11 Lagunita Drive home violated Special Conditions Two and Six of the 2015 CDP. The Commission asked that the remodel cease.

The enforcement letter stated, in relevant part:

"We have determined that new development has taken place on the property in violation of Special Conditions of the CDP. Special Condition #2 states that the seawall is only authorized so long as the residence is not 'redeveloped in a manner that constitutes new development.' As we describe in detail below, the residence has been redeveloped in a manner that constitutes new development. Because seawalls can displace beaches and contribute to erosion of beaches and thus negatively impact public

---

[3] This section of the Municipal Code is not part of the certified Local Coastal Program.

7

access and coastal resources, Special Condition #2, was included to ensure that the seawall is used only to protect the existing structure during its lifespan, and not any new development. Under Special Condition #2, if new development occurs, then the property owner must apply to remove the seawall or apply to modify the permit, which is discussed in more detail below.

"The term 'new development' is defined in multiple locations in the City of Laguna Beach's certified Local Coastal Program ('LCP'). New development is defined in the LCP to include 'improvements that increase the size or degree of nonconformity' of a structure. Reconstruction of the house that has occurred on the site meets the Commission-certified Laguna Beach Local Coastal Plan (LCP) Land Use Element 7.3.10 criteria of 'new development' of the existing structure and therefore has triggered the expiration of the seawall's authorization per the CDP. To parse that out, first, the structure is legally nonconforming with multiple different oceanfront bluff top setbacks. In addition, the improvements have replaced and fortified every part of the house, and therefore increased its lifespan. Thus, the improvements have increased the 'degree of nonconformity' per Action 7.3.10. The Commission has made clear on many occasions that improvements that increase the lifespan of a house increase the degree of nonconformity, and create additional negative impacts to coastal resources.

"Because the redevelopment constitutes 'new development' . . . , Special Condition #2 requires you to apply for a permit to remove the seawall or a permit amendment to keep the seawall. However, Land Use Element Actions 7.3.4 and 7.3.9 require that new development not rely on new or existing seawalls. In addition, Special Condition #6 of the CDP does not allow redevelopment of the existing structure to rely on the seawall. Thus, you must apply for a permit to remove the seawall. . . . [¶] . . . [¶]

"Finally, because the seawall is no longer authorized . . . , it is illegally limiting public access at Victoria Beach. Erosion caused by the seawall could negatively affect the beach, limiting public access, and causing other negative impacts to coastal

8

resources. Under Coastal Act Section 30821, the Commission is authorized to impose civil penalties on anyone who violates the Coastal Act's public access provisions."

Throughout the next several months, there was an exchange of letters between representatives of the Katzes and the Coastal Commission; however, the Katzes continued with the remodel of the residence.

In April 2018, the Coastal Commission began official enforcement proceedings by mailing the Katzes a "Notice of Intent to Commence Cease and Desist Order and Administrative Civil Penalties Proceedings." In response, the Katzes submitted a statement of defense. The Katzes' position was generally "that demolition of the exterior elevations amounted to 9.8% of the total, while demolition of the floor and roof totaled 3.5% -- far below the 50% threshold set forth in the City's LCP and completed pursuant to the City's determination that the work constitutes an exempt 'minor remodel' prior to the Staff's initial April 17, 2017 enforcement letter."

In July 2018, the Coastal Commission posted a staff report for an upcoming enforcement hearing. The Commission's report was over 1,400 pages including exhibits (the entire administrative record is over 8,227 pages). The staff recommended the Commission approve a cease and desist order and impose a $500,000 administrative penalty. The following month, the Commission conducted a public hearing. At the conclusion of the hearing, all the Commission members voted unanimously to issue a cease and desist order and to impose a $1 million administrative penalty.

*Court Proceedings*

In August 2018, the Katzes filed a petition for writ of mandate and application for a stay of the cease and desist order and penalty.

In September 2018, the trial court issued a partial stay order: "The Court concludes it is appropriate to maintain the status quo and stay the removal of the wall and the payment of the fine until this Court resolves the merits of this lawsuit. However, it is

9

not appropriate to stay the order prohibiting new development that may violate Commission requirements, as well as the beach access requirement."

In October 2019, after conducting a hearing, the trial court denied the Katzes' petition for writ of mandate as to the cease and desist order (affirming the Coastal Commission's ruling). The court found that the Commission acted within its jurisdiction, conducted a fair hearing, and its findings were supported by the evidence. The court granted the Katzes' petition for writ of mandate as to the administrative penalty (reversing the Commission's ruling). The court reversed the administrative penalty based on the Katzes' good faith defense.

The Katzes filed an appeal and the Coastal Commission filed a cross-appeal. The City filed an amicus curiae brief in support of the Katzes.

II

DISCUSSION

Courts review Coastal Commission rulings for an abuse of discretion. (See Code Civ. Proc., § 1094.5, subd. (b).) "'An abuse of discretion is established if the [Commission] has not proceeded in a manner required by law, the order . . . is not supported by the findings, or the findings are not supported by the evidence.'" (See *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810.) As to questions involving pure questions of law, courts exercise independent review. (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.)

"'In reviewing the agency's decision, the trial court examines the whole record and considers all relevant evidence . . . .' [Citation.] Substantial evidence means evidence ""'"of ponderable legal significance."'""" (*Schafer v. City of Los Angeles, supra,* 237 Cal.App.4th at p. 1260.) An appellate court similarly reviews the Coastal Commission's action, not the trial court's decision. (*Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 921-922 (*Ross*).)

10

Under the abuse of discretion standard, a court does not "'substitute[] its own findings and inferences for that of the Commission. Rather, it is for the [agency] to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.'" (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921.) Courts presume the Commission's findings are supported by substantial evidence; it is the appellant's burden to demonstrate to the contrary. (*Ibid.*)

In this discussion we will: A) address the Katzes' appeal from the trial court's approval of the cease and desist order; and B) address the Coastal Commission's cross-appeal from the trial court's denial of the administrative penalty.

## A. *The Katzes' Appeal From the Cease and Desist Order*

The Coastal Act authorizes judicial review of a Coastal Commission cease and desist order by way a petition for writ of mandate. (See § 30801.) Judicial review of a Commission's order is limited to whether the agency "has proceeded without, or in excess of, jurisdiction; whether there was a fair trial [or hearing]; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).)

Here, the Katzes argue the Coastal Commission acted in excess of its jurisdiction in issuing the cease and desist order. The Katzes further argue the Commission abused its discretion because the order was not supported by the evidence. The Katzes do not challenge the fairness of the public hearing.

Accordingly, in this part of the discussion we will: 1) consider general principles of law regarding the Coastal Act; 2) analyze whether the Coastal Commission

11

acted in excess of its jurisdiction in issuing the cease and desist order; and 3) analyze whether the cease and desist order is supported by substantial evidence.[4]

### 1. General principles of law concerning the Coastal Act.

When enacting the Coastal Act: "'The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . ."'" (*Pacific Palisades, supra*, 55 Cal.4th at pp. 793-794.)

"The Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' [Citation.] Under it, with exceptions not applicable here, any person wishing to perform or undertake any development in the coastal zone must obtain a [CDP] 'in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency . . . .'" (*Pacific Palisades, supra*, 55 Cal.4th at pp. 793-794.)

The word "development" as used in the Coastal Act is expansive. (§ 30106.) "'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any

---

[4] The Katzes argue this court should apply the independent judgment test because their "interest in the 11 Lagunita property qualifies as a fundamental vested right." We disagree. For purposes of review of an agency's action, there is no fundamental vested right to own property free from regulation. (See, e.g., *Barrie v. California Coastal Com.* (1987) 196 Cal.App.3d 8, 12-15 [homeowners did not possess a fundamental vested right to build a protective seawall].) In any event, we would come to the same conclusions and disposition were we to exercise our independent judgment.

12

gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision . . . ; change in the intensity of use of water, or of access thereto; *construction, reconstruction, demolition, or alteration of the size of any structure* . . . . [¶] As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (§ 30106.)

Local agencies that lie in any part of the coastal zone must develop a Local Coastal Program that implements the requirements of the Coastal Act. The Local Coastal Program includes a land use plan and zoning ordinances, all of which must be consistent with the Coastal Act. (§§ 30001.5, 30500-30526; *Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.) Any development in the coastal zone must comply with the local agency's Local Coastal Program and the Coastal Act. (§ 30600, subd. (a).)

At the state level, the Coastal Commission ensures local governments comply with the Coastal Act in a variety of ways. For instance, the Commission must certify that a Local Coastal Program complies with the Coastal Act before it can take effect. (§ 30500, subd. (a).) If a local agency attempts to amend its Local Coastal Program, the Commission must approve the modification. (§ 30514, subd. (a).) The Commission also has jurisdiction to review the actions of a local agency to the extent it allows development in its coastal zone. For example, if a local agency issues a CDP under its Local Coastal Program, the Commission may, if the permitting decision is appealed, independently review the permit application to determine if it complies with the Local Coastal Program and is consistent with the Coastal Act. (§ 30600.5, subd. (d).)

The City is largely included within the coastal zone. The City's Local Coastal Program defines a "Major Remodel" as follows: "Alteration of or an addition to an existing building or structure that increases the square footage of the existing building or structure by 50% or more; or demolition, removal, replacement, and/or reconstruction

of 50% or more of the existing structure; greater specificity shall be provided in the Laguna Beach Municipal Code."

The City's Local Coastal Program also includes the following: "Allow oceanfront and oceanfront bluff homes, . . . or other principal structures, that are legally nonconforming as to the oceanfront and/or oceanfront bluff edge setback, to be maintained and repaired; however, improvements that increase the size or degree of nonconformity, *including but not limited to development that is classified as a major remodel* pursuant to the definition in the Land Use Element Glossary, shall constitute new development and cause the pre-existing nonconforming oceanfront or oceanfront bluff structure to be brought into conformity with the LCP." (Italics added.)

*2. Whether the Coastal Commission had the statutory jurisdiction to issue a cease and desist order.*

The Coastal Act provides: "If the commission, after public hearing, determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing a permit or (2) *is inconsistent with any permit previously issued by the commission*, the commission may issue an order directing that person or governmental agency to cease and desist." (§ 30810, subd. (a), italics added.)

The Coastal Act further provides: "The cease and desist order may be subject to such terms and conditions as the commission may determine are necessary to ensure compliance with this division, including immediate removal of any development or material or the setting of a schedule within which steps shall be taken to obtain a permit pursuant to this division." (§ 30810, subd. (b).)

Here, in October 2015, the Coastal Commission issued a CDP allowing for the reinforcement of the seawall located at 11 Lagunita Drive, subject to various conditions. Special Condition Two required that the seawall had to be removed if the

14

residence was "redeveloped in a manner that constitutes new development . . . ." Special Condition Two further provided: "Prior to the anticipated expiration of the permit and/or in conjunction with redevelopment of the property, the Permittee shall apply for a permit amendment to remove the seawall or to modify the terms of its authorization." Special Condition Six required: "Any future new development on the site shall be sited and designed to be safe without reliance on shoreline protective devices."

After conducting a hearing, the Coastal Commission determined the Katzes had violated the 2015 CDP and issued the cease and desist order. The Commission found the remodel of the residence was "inconsistent" with the CDP it had previously issued for the reinforcement of the seawall. (See § 30810, subd. (a).) Thus, we find that the Commission acted within the scope of its jurisdiction by issuing the cease and desist order, which requires the Katzes to remove the seawall. (See § 30810, subd. (b).)

The Katzes generally argue that the Coastal Commission did not file an appeal or file a writ of mandate within 90 days to challenge the City's decision that their remodel was not a "major remodel." Based on this, the Katzes argue the Commission was estopped from issuing the cease and desist order. We disagree.

"'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) [the party to be estopped] must intend that his conduct shall be . . . acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) [the other party] must rely upon the conduct to his injury.'" (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1359.) Further, "it is settled that where even one of the requisite elements for estoppel is missing, it does not apply." (*Id* at p. 1360.)

Here, the Katzes acknowledge the Coastal Commission did not receive "notice of the City's determination until at least January 2017—after the Katzes had already completed a significant portion of the construction on the project."

15

Therefore, the first element of equitable estoppel is not present because the party to be estopped (the Coastal Commission) was not apprised of the facts (the City's approval of the remodel). The Katzes are correct that the Commission did not file an appeal from the ruling of the City, nor did the Commission file a petition for a writ of mandate. However, the Katzes could not have reasonably interpreted the Commission's silence as its approval of the redevelopment of the residence under the terms of the 2015 CDP. Indeed, Special Condition Two required the Katzes to apply *to the Commission* for an amendment or a modification of the CDP "in conjunction with redevelopment" of the residence. Thus, equitable estoppel does not apply.

The related doctrine of collateral estoppel "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) Collateral estoppel applies: "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.* at pp. 824-825.)

Here, the City determined that the remodel of the residence at 11 Lagunita Drive did not constitute a "major remodel" and thus was exempt from requiring a CDP. But the issue later decided by the Coastal Commission (and the subject of this appeal) was not identical. The relevant issue before the Commission was whether the residence had been "redeveloped in a manner that constitutes new development" and consequently whether there was a violation of the 2015 CDP the Commission had previously issued. Therefore, because the issues in the two proceedings were not identical, the doctrine of collateral estoppel does not apply.

The Katzes also argue the Commission is bound by the decision of the City that their remodel was not a "major remodel" under res judicata principles. We disagree.

Under the doctrine of res judicata a party is precluded from litigating an identical claim in a subsequent proceeding. (*Takahashi v. Board of Education* (1988)

16

202 Cal.App.3d 1464, 1473-1474.) "*Claim preclusion* 'prevents relitigation of the same cause of action in a second suit between the same parties . . . .' [Citation.] Claim preclusion arises if a second suit involves (1) the same cause of action (2) between the same parties [or those in privity with them] (3) after a final judgment on the merits in the first suit. [Citations.] If claim preclusion is established, it operates to bar relitigation of the claim altogether." (*DKN Holdings LLC v. Faerber*, *supra*, 61 Cal.4th at p. 824.)

Here, the Coastal Commission was not a party to the proceedings that took place between the City and the Katzes regarding the City's approval of the remodel. Indeed, the Katzes' agent and architect Conrad specifically avoided involving the Commission. Thus, the doctrine of res judicata does not apply.

The Katzes also argue: "The Commission may not use the enforcement of the [2015] CDP to expand its limited jurisdiction." (Capitalization & boldfacing omitted.) Quoting a portion of the Coastal Act, the Katzes state: "The Coastal Act expressly provides that development review authority 'shall no longer be exercised by the Commission' once the Commission has certified a local government's [Local Coastal Program]."

The City makes essentially the same argument: "The Coastal Commission improperly usurped the City's reserved authority and powers by constructively amending the City's certified local program unilaterally and without adherence to required formalities." (Capitalization & boldfacing omitted.) The City further argues: "The Coastal Commission's noncompliant attempt to unilaterally amend the City's certified local program, by revising the 'major remodel' definition, threatens to disrupt the City's processing of remodel projects." (Capitalization & boldfacing omitted.)

However, the jurisdictional issue before this Court does not concern the jurisdictional relationship between the City and the Coastal Commission. Nor are we concerned with the City's processing of other remodel projects. Nor are we evaluating

17

whether the City acted properly—or improperly—in exercising its local "development review authority" under the Coastal Act. (See § 30519, subd. (a).)

As the superior court stated, "this case is not about approving new development. It's about whether the [Katzes] violated any conditions of their sea wall permit from the Coastal Commission. And that's an issue for the Commission, not for the City of Laguna Beach." As in the superior court, the narrow jurisdictional issue before this court is whether *the Commission* acted within the scope of its jurisdiction in issuing the cease and desist order based on the Katzes' alleged violation of the 2015 CDP, which had been previously issued *by the Commission*. (See *Fukuda v. City of Angels*, *supra*, 20 Cal.4th at p. 810.)

Again, because the Coastal Act specifically gives the Coastal Commission the jurisdiction to issue cease and desist orders to enforce the provisions of "any permit previously issued by the commission" we find the Commission acted well within the scope of its jurisdiction. (See § 30810, subd. (a).) We now turn to whether the Commission abused its discretion by finding the Katzes had violated the 2015 CDP; that is, whether the cease and desist order was supported by substantial evidence.

*3. Whether there is substantial evidence in the administrative record supporting the cease and desist order.*

"The agency's findings and actions are presumed to be supported by substantial evidence. [Citations.] A person challenging an administrative determination bears the burden of showing the agency's findings are not supported by substantial evidence." (*Ross*, *supra*, 199 Cal.App.4th at p. 921.) "'Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the

18

evidence before it, a reasonable person could not have reached the conclusion reached by it.'" (*Id.* at pp. 921-922.)

Prior to the public hearing regarding the alleged violation, the Coastal Commission staff prepared a 70-page report outlining its recommendations and findings. The report also included approximately 1,380 pages of exhibits (maps, photographs, e-mails, letters, memorandum, etc.). The report further included a summary of its findings of facts, including: "6. Unpermitted development and redevelopment, including demolition, reconstruction, and alteration of a structure . . . has all occurred on the property, without a CDP and inconsistent with the Permit."

On August 9, 2018, the Coastal Commission held a public hearing. Pat Veesart, a Commission enforcement supervisor and an experienced contractor, testified: "My observation generally is that this is a major project that involves the re-engineering and rebuilding of an existing older home. In my opinion the project undertaken at 11 Lagunita Drive far exceeds any common sense understanding of ordinary repair and maintenance, and I don't know anybody in the construction industry who would characterize it as such." Veesart narrated a number of slides and photographs during an extensive presentation showing the scope of the remodel (examples below).





Veesart noted: "Interior walls are removed, plumbing, wiring, railings, stairs, et cetera, were also all removed." Veesart said that in one photograph "you can see a carpenter in the process of adding or sistering new joists to old joists. It appears that these new joists are taller and stiffer, thereby significantly increasing the load-bearing strength of the deck roof." Veesart observed "they have started sheeting the deck roofs with new plywood. Plywood sheeting forms a diaphragm that spreads the load and gives greater strength and resistance to lateral movement. Also note that more interior framing and some framing has been added to exterior walls as well." Veesart noted: "This present-day framing system results in a house that is much stronger than a typical house that was built in the 1950s."

Veesart said that one of the photographs "shows a new structural steel or red iron beam being lifted into place by a crane. The addition of steel beams to this residential project is an indication that the structure of the original house is being significantly modified." Veesart said "workers have reconstructed a portion of the roof and are stripping off roofing material in preparation for a new roof." Veesart stated, "I'm going to pan quickly through some interior views of the house so you can get an idea of the scope of the project. In this photograph we see new interior wall framing, ceiling

20

framing, new wiring, new plumbing, et cetera." Veesart showed comparisons of the interior of the residence before and after the remodel (examples below).





The commissioners also heard the testimony of several members of the public, all of whom testified in support of the staff's recommendations. One member of the public stated: "If the California Coastal Commission does not act in accordance with the law and the letter of the permit, other homeowners and developers on the coast will see this example and act in the same manner, potentially rendering permit requirements useless in the future."

Ultimately, the commissioners voted unanimously to issue an amended cease and desist order, which required the Katzes to remove the seawall within 60 days (although the Executive Director could extend the deadline if needed).

Here, we find the testimony during the hearing, as well as photographs of the remodel, constitute substantial evidence the Katzes violated the special conditions of the 2015 CDP. In other words, the evidence supports a finding that the residence was "redeveloped in a manner that constitutes new development" by any reasonable definition or understanding of those terms. Indeed, the Coastal Act's definition of the word "development" includes the "construction, reconstruction" or "demolition" of any structure. (§ 30106.) Based on this evidence, we cannot say that "'a reasonable person could not have reached the conclusion reached by'" the Coastal Commission. (*Ross*, *supra*, 199 Cal.App.4th at p. 922.) Thus, under the substantial evidence test (or under an independent standard of review), we affirm the cease and desist order.

The Katzes do not argue that the home was not redeveloped in a manner that constitutes *new development*. Rather, the Katzes repeatedly seek to reframe the issue by arguing their home was not redeveloped in a manner that constitutes a *major remodel*. For instance, the Katzes argue "the Commission lacked sufficient evidence to conclude that the Katzes' project was a '*major remodel*,' rather than exempt 'repair and maintenance.'" (Italics added.) They also argue: "On the merits, the Commission enforcement proceedings can be reduced to one question: Was the Katzes' project a '*major remodel*' or exempt 'repair and maintenance'?" (Italics added.)

The Katzes have misidentified the issue. Whether the redevelopment of the 11 Lagunita Drive residence can be considered either a "major remodel" or exempt "repair and maintenance" is irrelevant. Special Condition Two of the 2015 CDP does not use the term *major remodel*; rather, it states that the residence cannot be "redeveloped in a manner that constitutes *new development*." (Italics added.) Special Condition Six of the CDP also does not use the term "major remodel"; rather, it states that: "Any future

22

*new development* on the site shall be sited and designed to be safe without reliance on shoreline protective devices." (Italics added.)

The Coastal Commission explained the difference between a major remodel and new development as follows: "Although there is [an] overlap between the phrases 'new development' and 'major remodel,' resulting from the fact that a major remodel, by definition, constitutes new development, new development and major remodels are separate classifications of development activities under the City's Local Coastal Program ('LCP'). See for instance, Section 7.3.10 of the LCP, which states, in part, '. . . *improvements that increase the size or degree of nonconformity, <u>including but not limited to development that is classified as a major remodel</u> pursuant to the definition in the Land Use Element Glossary, <u>shall constitute new development</u>. . . .*'"

On appeal, this court will not engage in an irrelevant analysis of whether the Katzes' remodel of their home can be characterized as a major remodel or not. To reiterate, the statutorily limited scope of our review is: 1) whether the Coastal Commission acted within its jurisdiction in issuing the cease and desist order; and 2) whether the Commission abused its discretion (whether the order was supported by substantial evidence). (See Code Civ. Proc., § 1094.5, subd. (b).)

In sum, we find the Coastal Commission acted well within the scope of its jurisdiction and substantial evidence supports the Commission's finding that the Katzes violated the 2015 CDP by redeveloping the 11 Lagunita residence in a manner that constitutes *new development*.[5] Thus, we affirm the cease and desist order in all respects.

---

[5] Because we are upholding the cease and desist on these grounds, we need not address the Katzes additional claim that: "The Commission also erroneously concluded that the 11 Lagunita project could not qualify as exempt repair and maintenance because it was 'located within 50 feet of a coastal bluff edge and within a sand area.'"

*B. The Commission's Cross-Appeal From the Administrative Penalty*

The Coastal Commission argues the trial court erred when it granted the Katzes' petition for a writ of mandate as to the administrative penalty. We agree.

As with the cease and desist order, an administrative penalty is analyzed under an abuse of discretion standard of review. "Judicial interference with an agency's assessment of a penalty 'will only be sanctioned when there is an arbitrary, capricious or patently abusive exercise of discretion by the administrative agency.'" (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 54.) A reviewing court cannot substitute its own judgment regarding a penalty for that of the agency; a reviewing court cannot lower a penalty because it believes the agency's decision was "'too harsh.'" (*Id.* at p. 75.)

"With respect to the question of penalty, the superior court's powers of review are quite limited, and are exercised only with great deference to the administrative agency's findings. [Citation.] Neither the trial court nor the appellate court is entitled to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. [Citation.] The trial court may vacate but not modify the agency's determination of penalty if it finds a manifest abuse of discretion. [Citation.] The appellate court conducts a de novo review of the penalty assessed, giving no deference to the trial court's determination. Again, the appellate court reviews the agency's selection of penalty and, if reasonable minds can differ with regard to the propriety of the disciplinary action, it finds no abuse of discretion." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 45-46.)

In this part of the discussion, we will: 1) consider the statutory framework for administrative penalties under the Coastal Act; 2) review the relevant proceedings in this case; and 3) analyze whether the Coastal Commission abused its discretion when it ordered the Katzes to pay a $1 million administrative penalty.

24

*1. The statutory framework for an administrative penalty.*

One of the "basic goals" of the Coastal Act is to: "Maximize *public access to and along the coast* and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners." (§ 30001.5, subd. (c), italics added.)  Public access is not limited to access to the coastal beaches, but also includes access to the Pacific Ocean itself.  "Development shall not interfere with the public's *right of access to the sea . . .* , including, but not limited to, *the use of dry sand* and rocky coastal beaches to the first line of terrestrial vegetation." (§ 30211, italics added.)

"In addition to any other penalties imposed pursuant to this division, a person, including a landowner, *who is in violation of the public access provisions of this division* is subject to an administrative civil penalty that may be imposed by the commission in an amount not to exceed 75 percent of the amount of the maximum penalty authorized pursuant to subdivision (b) of Section 30820 for each violation ['not less than one thousand dollars ($1,000), nor more than ($15,000), per day'].  The administrative civil penalty may be assessed for each day the violation persists, but for no more than five years." (§ 30821, subd. (a), italics added.)  "In determining the amount of civil liability, the commission shall take into account the factors set forth in subdivision (c) of Section 30820." (§ 30821, subd. (c).)

"In determining the amount of civil liability, the following factors shall be considered:  [¶]  (1) The nature, circumstance, extent, and gravity of the violation.  [¶] (2) Whether the violation is susceptible to restoration or other remedial measures.  [¶] (3) The sensitivity of the resource affected by the violation.  [¶]  (4) The cost to the state of bringing the action.  [¶]  (5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require." (§ 30820, subd. (c).)

25

## 2. *The relevant proceedings in this case.*

On April 17, 2017, the Coastal Commission issued a notice of violation concerning the 2015 CDP (this was the beginning date for the Commission's calculation of the fine). In addition to its allegations about the CDP violation, the Commission also noted: "Under Coastal Act Section 30821, the Commission is authorized to impose civil penalties on anyone who violates the Coastal Act's public access provisions."

The Coastal Commission stated the following: "At the property, it is clear that extending the life of the nonconforming house will cause increased impacts to coastal resources. Unpermitted reconstruction of the property would increase the degree of nonconformity by significantly extending the time that the pre-Coastal Act structure is authorized to remain in place; permitted reconstruction would likely result in removal of the seawall. The longer the seawall exists, the more damaging coastal resource impacts resulting from the seawall will be. Seawalls on an eroding beach will eventually destroy the beach by not allowing the beach to move inland naturally."

In the report prepared prior to the hearing, the Coastal Commission found that during the spring "little dry sand existed in front of the seawall relative to the rest of Victoria Beach. The pictures . . . show how there were only a few feet of dry sand left in front of the seawall. Wet sand stretched almost to the seawall itself, which showed that any one on the beach at that time would have an extremely narrow area of beach to traverse. Therefore, during certain seasons and particularly during high tides and swells, public access appears to be especially affected by the lack of dry sand available to traverse to the other side of the beach or to even use the public easement and State tidelands in front of the seawall for recreation."

The Coastal Commission staff made findings as to each of the five relevant factors to determine the amount of civil liability, ultimately recommending "the imposition of a substantial civil liability." (See § 30821, subd. (b).) We will now quote extensively from those findings.

26

"The nature, circumstance, extent, and gravity of the violation." (See § 30820, subd. (c)(1).) The Coastal Commission found: "The nature and circumstance of the violation at hand includes (1) the performance of the development that the Katzes knew or should have known would require Coastal Act authorization, without that authorization, achieved by intentionally avoiding Commission review; (2) the retention of a seawall that the Commission had made clear was having an adverse impact on public access, in spite of the fact that the Katzes undertook development that clearly triggered the Permit conditions requiring removal of the seawall, and in violation of the Permit conditions that were specifically required in order to prevent such public access impacts; and (3) the use of the seawall to protect new, unpermitted development. . . . [The Katzes] also declined to take advantage of the opportunity to halt the ongoing violation when they were informed of the issues, and rather than avoid incurring additional harm to coastal resources, costs and risks, instead continued with the unpermitted work. In sum, the Commission finds that the application of this factor warrants a high penalty."

"Whether the violation is susceptible to restoration or other remedial measures." (§ 30820, subd. (c)(2).) The Coastal Commission found "the loss of public access during the time when the wall caused the loss of sand is not easily susceptible to remedial measures. The Katzes have been in violation of the underlying CDP for more than two years, and substantial amounts of sand have been trapped in the bluff behind the seawall and/or scoured off the beach as a result of the wall. The seawall has therefore caused public access impacts, especially during particular seasons and swell events. . . . In addition, it will likely still be a significant period of time before the Katzes remove the seawall and, if necessary, modify the house and/or provide for an alternate method of protection that does not impact the beach. On the other hand, the violation itself, rather than the past impacts of that violation, can be remedied by the removal of the seawall, and sand can be placed on the beach such that, going forward, there would be no ongoing

27

public access impacts. In sum, the Commission finds that the application of this factor warrants a moderate penalty."

"The sensitivity of the resource affected by the violation." (§ 30820, subd. (c)(3).) The Coastal Commission found: "Laguna Beach does not have as many wide, sandy beaches as other parts of Orange County, and therefore, the sand is especially important. In addition, many parts of the coast in Laguna Beach have large seawalls that negatively impact public access . . . . However, other than 11 Lagunita, . . . this section of Victoria Beach is not characterized by vertical seawalls. Therefore, this beach is relatively free of large seawalls, and thus, it is more sensitive to the impacts of this seawall, and is a sensitive resource. On the other hand, there are times of year when the sandy beach likely remained fairly broad, showing that the resource was not so sensitive as to be continually substantially diminished by this violation. Therefore, in light of that, Commission finds that the application of this factor warrants a moderate penalty."

"The cost to the state of bringing the action." (§ 30820, subd. (c)(4).) The Coastal Commission found "the costs to the state have been significant. The State has had to expend its limited resources in order to restore public access to the sandy beach that should have already existed, had the CDP been complied with. Instead of complying in any way, the Katzes refused to stop construction, sued the Commission, and then undertook time-consuming and costly discovery. The Commission has worked on this enforcement case for more than a year and a half, all because the Katzes decided not to apply for a CDP before undertaking the unpermitted development. Had the Katzes applied for a CDP as they were clearly required to, it would have saved the Commission significant time, money, and staff resources. Thus, the Commission finds that the application of this factor warrants a moderate to high penalty."

"With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and

28

such other matters as justice may require." (§ 30820, subd. (c)(5).)  The Coastal Commission found "no information to indicate that the Katzes have a history of violations.  On the other hand, the Katzes have been particularly uncooperative.  As to the issue of 'economic profits, if any, resulting from, or expected to result as a consequence of, the violation,' although they have stated their desire to sell the property for a significant increase over the purchase price, if the orders are complied with . . . , it appears that they would not reap the same economic benefits from the violations.  Therefore, it appears that this factor would support a moderate penalty.

"Aggregating these factors, the Commission finds that a moderate to high penalty could be justified here.  Imposing 50 percent of the maximum penalty for 365 days would result in a penalty of just over $2 million ($11,250 x .5 x 365).  Thus, a $2 million penalty would be justified.  Imposing 25 percent of the maximum penalty would obviously result in a penalty of approximately $1 million.

"Applying those general factors here, and if the actual date of the demolition to today's date were used to calculate the number of days of violation, the Commission could actually justify imposing a penalty up to a maximum of $8.3 million in this case, given the severity of the violation, the Katzes' refusal to stop construction work or consider any other alternatives to the seawall, the substantial amount of Commission staff work attempting to resolve this violation, the significant Coastal Act resources impacted by the violation—Victoria Beach and public access to it now and in the future—and the significant public and legal policies at issue here, including the need to secure compliance with Commission CDPs and CDP conditions regarding seawalls, and the importance of public access in this area and of avoiding building seawalls in general, especially in light of sea level rise.  And if one calculated the penalty to run until the violation were resolved, it would clearly be even higher.

"However, . . . Commission staff wants to focus on the injunctive solution that will help to restore public access at Victoria Beach; namely, removing the seawall

29

and modifying the house and/or applying for alternate methods of protecting the house that do not impact the beach. In addition, litigation has already occurred and the Katzes have threatened more litigation, and so there is a likely chance that the Commission will be able to seek further 30820 penalties in litigation. Therefore, Commission staff recommends using prosecutorial discretion to impose a lower penalty than allowable by the factors discussed above. Therefore, staff recommends . . . an administrative penalty amount in the range between $400,000 and $900,000, with a recommended amount of $500,000, recognizing that further section 30820 penalties may be sought in litigation."

At the public hearing in August 2018, the commissioners addressed the administrative penalty in conjunction with the cease and desist order. At the conclusion of the staff's presentation, the commissioners were given the opportunity to ask questions of the staff members and others present at the hearing.

One of the commissioners asked: "Were [the Katzes] still engaging in the renovations and the rebuilding of this structure when the Coastal Commission enforcement staff contacted them?" An enforcement analyst responded, "Yes, our -- our letter was sent in April of 2017, and the work continued for a year after that. We . . . asked them to stop in that letter and that's -- that letter is an exhibit to the staff report."

The chief of enforcement stated: "Yeah, I was just going to add that we were really trying to stop the violation before it was completed. We have a pretty good track record -- of when we find something . . . that's in process, if we can stop it, it saves both the potential violator money and it -- it makes it easier to restore the coastal resource more quickly. [¶] So we thought that we could do something to stop it . . . and we tried to do that. That's what the first letters and the first calls were doing . . . and when that was unsuccessful, the other thing that we try to do is we usually try to settle, and you saw a slide where you saw all the times that we tried to approach them, and we tried even as recently as in the last few weeks to try to work this out. And we were not able to do so." The Coastal Commission's counsel stated: "We got responses, we just didn't ever get a

30

response to our request that they stop, or a response to our request that we be able to visit the site. So yes, they did send letters back, but they never stopped work and they never said, yes, you can come visit the site."

Coastal Commissioner Steve Padilla asked questions of the Katzes' architect and agent Conrad. The commissioner asked Conrad about a letter written by staff that memorialized a phone conversation. The letter from staff to Conrad stated: "According to your timeline of events, the [Katzes] wanted to remodel the house without getting a CDP or dealing with the Coastal Commission at all. Knowing that development on the site could trigger the requirement for a CDP from the Commission per [the 2015 CDP], which you obtained as a representative of the previous owner, you purportedly sought input from the City of Laguna Beach regarding what would constitute development that would require a CDP. However, you did not contact Coastal Commission staff for their input at this time."

After Commissioner Padilla quoted from the letter, the following dialogue occurred:

"COMMISSIONER PADILLA: So my question is is [*sic*] that a fairly accurate representation of that phone conversation on April 19th?

"MR. CONRAD: I would say yes, it's fairly accurate. It was a couple of years ago --

"COMMISSIONER PADILLA: Okay.

"MR. CONRAD: -- but we -- we understood --

"COMMISSIONER PADILLA: I just . . . need you to let me know whether it's a fairly accurate representation --

"MR. CONRAD: It's not -- it's not completely accurate.

"COMMISSIONER PADILLA: Okay. What about it is not accurate?

"MR. CONRAD: The part that is not completely accurate is that, if I had it in front of me I could maybe -- maybe go through it a little bit more specifically, but we

31

understood that what our restrictions are with the seawall. And the application that we made, we believed did not violate any of those restrictions, and so --

"COMMISSIONER PADILLA: I understand that was your belief, but did you convey to the staff that it was the desire of the Katzes given the point in time on the timeline to not have to deal with the Coastal Commission if at all possible?

"MR. CONRAD: No. It was the desire of the Katzes to do a remodel that would not violate the conditions of their approval. That's the part that's not accurate.

"COMMISSIONER PADILLA: Was it their desire to avoid the necessity for a [CDP]?

"MR. CONRAD: Well, one of the things that we understood would be a violation -- or one of the things that we understood require us to come back to the Coastal Commission is if we needed a new CDP, we would have to get the seawall reapproved, and we understood that probably wouldn't happen. So we weren't necessarily trying to avoid the Coastal Commission, we were trying to comply with the conditions as we understood them.

"COMMISSIONER PADILLA: Okay. And it also indicates that you sought clarification from the local jurisdiction, but the permit was issued from the Commission in 2015. Why didn't you consult the Commission?

"MR. CONRAD: We didn't feel that it was necessary. We thought it was very clear that we were following the conditions. We went over it. The City is the permitting agency for minor remodels, and the restriction was that we could not do any major remodels, and we didn't propose a major remodel, so it just -- it never -- the thought never entered my mind that I should come to the Coastal Commission for a minor remodel, because were allowed to do that with -- we were not -- it would not violate the condition of our approval for the seawall."

At the conclusion of the hearing, another commissioner moved to "find that 11 Lagunita LLC and Jeff and Tracy Katz are in violation of the public access provisions

32

of the Coastal Act and that the Commission impose upon them an administrative civil penalty in the amount of $1 million pursuant to the findings of the hearing and of the staff reports and analysis in all of the documents . . . and that this fine shall be required to be paid within 60 days." Katzes' counsel chose "not to argue with what the fine would be" and the commissioners voted unanimously in favor of the motion.

### 3. *The application and analysis of the law as applied to the facts.*

The Coastal Commission thoroughly evaluated and made extensive findings regarding the five factors before adopting those findings. (See § 30820, subd. (c).) There is no indication the Commission acted in an arbitrary or capricious manner. Quite the opposite. The Commission appears to have acted in a quite rational and professional manner. Notably, the $1 million penalty was smaller than the potential penalty that could have been imposed ($8.3 million). Thus, we find no abuse of discretion and we affirm the $1 million penalty under section 30821. [6]

The Katzes argue: "The Commission lacked authority to impose an administrative penalty based on the Katzes' alleged development violations." (Capitalization & boldfacing omitted.) We disagree.

In addition to administrative penalties imposed by the Coastal Commission for public access violations under section 30821 (as in this case), a superior court can also impose civil penalties for any development "that is inconsistent with any [CDP] previously issued by the commission . . . in an amount that shall not exceed thirty

---

[6] This court questions the nexus between the Katzes' violation of the 2015 CDP and the second factor: "Whether the violation is susceptible to restoration or other remedial measures." (§ 30820, subd. (c)(2).) By violating the CDP's special conditions, the Katzes have effectively hastened the removal of the seawall, and thereby presumably lessened its detrimental effects to the beach. However, we also find the weighing of the other four factors justify the imposition of the penalty imposed by the Commission.

thousand dollars ($30,000) and shall not be less than five hundred dollars ($500)."
(§ 30820, subd. (a)(1).)

Here, the Katzes appear to be arguing that only one penalty can be imposed for their alleged violation of the CDP and that it can only be imposed by the superior court under section 30820. But the Katzes cite no legal authority in support of that notion. (See *Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 447-448 ["A brief must contain reasoned argument and legal authority to support its contentions, or the court may treat the argument as waived"].) Indeed, the Commission staff recommended the Coastal Commission exercise "prosecutorial discretion" and not impose a more severe penalty under section 30821 because "further section 30820 penalties may be sought in litigation." Thus, we reject the Katzes' argument regarding the purported lack of authority of the Commission to issue the administrative penalty under section 30821.

The Katzes also argue: "Public access is not at issue in this case. The Katzes' project pertained solely to the residence at 11 Lagunita and did not involve enlargement of the residence's footprint. Because the project maintained the residence's floor area, height, and bulk, public access to the adjacent Victoria Beach remained exactly as it had existed before the project." We disagree.

Similar to the word "development" the phrase "public access" under the Coastal Act is broadly construed. (*Surfrider Foundation v. California Coastal Com.* (1994) 26 Cal.App.4th 151, 157-158 ["we conclude the public access . . . policies of the Coastal Act should be broadly construed to encompass *all* impediments to access, whether direct or indirect, physical or nonphysical"].) Public access is not limited to the right to access a particular beach, it also includes the public's right to access the sea itself, as well as the dry sand on the beach: "Development shall not interfere with the public's *right of access to the sea* . . . , including, but not limited to, *the use of dry sand* and rocky coastal beaches to the first line of terrestrial vegetation." (§ 30211, italics added.)

34

Here, the Coastal Commission made findings concerning the general negative effects of seawalls. The Commission additionally found that the continued presence of the seawall at 11 Lagunita Drive also had specific adverse impacts on Victoria Beach, including decreasing the amount of dry sand. After the Commission notified the Katzes they had violated the CDP, and thus needed to remove the seawall according to the special conditions of the CDP, the seawall remained for over a year. Thus, the record supports the Commission's finding that the continued presence of the seawall violated the public access provisions of the Coastal Act. Further, as the Commission noted, the Katzes' remodel added decades to the useful life of the home, meaning that the seawall would be present for many more years into the future.

The Katzes also argue they "had a good faith belief in the lawfulness of their actions." (Capitalization & boldfacing omitted.) But there is evidence in the record to support the Coastal Commission's implied findings to the contrary.

"It has been held that a violator's good faith belief in the legality of his actions presented a defense to the imposition of civil penalties if such belief is found to have been *reasonably entertained*." (*Whaler's Village Club v. California Coastal Com.* (1985) 173 Cal.App.3d 240, 263.) Generally, under an abuse of discretion standard of review, if there are "no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence." (*Finney v. Gomez* (2003) 111 Cal.App.4th 527, 545.)

Here, the Commission staff noted that "a 'reasonable person' would have recognized that if [he or she] wanted to embark on a major construction project without triggering a condition imposed by a regulator[y] body, it would make sense to contact that regulatory body before doing so to be sure that the work would not trigger that condition. A reasonable person would have done so in any case, but even more so where that regulatory body had include[d] a condition (Standard Condition 3 of the Permit) reserving to itself the authority to interpret its conditions. A reasonable person would

35

certainly not have thought it prudent to avoid any contact with that body and could not claim innocent ignorance of the rules after having done so."

We agree. It appears to this court, based in part on Conrad's testimony, the Commission reasonably could conclude the Katzes deliberately sought to avoid the Coastal Commission's review of their proposed remodel of the home because they knew, or reasonably should have known, that the Commission staff would have found that the proposed redevelopment constituted new development in violation of the 2015 CDP. Further, the Commission reasonably could conclude the Katzes sought approval for the remodel from the City rather than the Commission in order to maintain the existing seawall, in further violation of the 2015 CDP.[7] Consequently, the Commission did not abuse its discretion in implicitly finding the Katzes were not acting with a *reasonable* good faith belief in the legality of their actions. (See *Finney v. Gomez*, *supra*, 111 Cal.App.4th at p. 545 ["the reviewing court will infer all findings necessary to support the judgment"].)

In sum, we find no abuse of discretion as to Coastal Commission's penalty order. The Katzes have shown no basis for this court to absolve them of the properly imposed $1 million administrative penalty.

---

[7] At oral argument, the Katzes argued there was no "process" or "procedure" for them to contact the Coastal Commission (rather than the City) in conjunction with the remodel. They are mistaken. Special Condition Two of the 2015 CDP specifically provided: "Prior to the anticipated expiration of the permit *and/or in conjunction with redevelopment of the property*, the Permittee shall *apply for a permit amendment* to remove the seawall or to modify the terms of its authorization." (Italics added.) Further, Commissioner Padilla asked Conrad why he did not consult with the Coastal Commission prior to the remodel. Conrad did not say that he was unable to do so; rather, Conrad said: "We didn't feel that it was necessary." In the absence of any evidence to the contrary, we presume the Katzes could have consulted with the Commission prior to the remodel through normal means (e-mail, letter, phone, etc.).

## III

## DISPOSITION

The trial court's order denying the petition for writ of mandate as to the cease and desist order is affirmed. The trial court's order granting the petition for writ of mandate as to the administrative penalty is reversed. Each party shall bear their own costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.

Filed 12/18/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| 11 LAGUNITA, LLC, et al., | |
| Plaintiffs and Appellants, | G058436 |
| v. | (Super. Ct. No. 30-2018-01013545) |
| CALIFORNIA COASTAL COMMISSION, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Appellant. | |

Appellant California Coastal Commission has requested that our opinion, filed on December 4, 2020, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).

The request is GRANTED. The opinion is ordered published in the Official Reports.

MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.